IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

YORAM RAZ                                                   PLAINTIFF

        v.              Civil No. 02-5184

ROBERT MUELLER, FBI DIRECTOR                               DEFENDANT

    and

YORAM RAZ                                                   PLAINTIFF

        v.

UNITED STATES                                              DEFENDANT


<u>MEMORANDUM OPINION AND ORDER</u>

On the 18th day of July, 2005, the captioned matters came on
for trial to the Court, plaintiff appearing in person, *pro se*, and
defendants appearing through counsel only.  The Court heard the
testimony of witnesses, received documentary evidence, and
entertained closing arguments from the parties, and now makes the
following findings of fact and conclusions of law:

### Procedural History

1.  Plaintiff Yoram Raz ("Raz") brought two separate
lawsuits arising out of his claim that the FBI has carried out
unwarranted surveillance against him spanning many years.  The
first case, assigned case number 02-5184, is a claim for
injunctive relief against FBI Director Robert Mueller brought
pursuant to **28 U.S.C. §1331**.  The second case, assigned case
number 02-5193, is a claim against the United States for money

damages under the Federal Tort Claims Act ("FTCA"), alleging the torts of invasion of privacy and intentional infliction of emotional distress.

2.    The two cases were initially consolidated for discovery only.  At the beginning of trial, and with the agreement of all parties, they were consolidated for all purposes, inasmuch as the same proof is relevant to both cases.

3.    Shortly before trial, defendants filed a **Motion In Limine To Bar Testimony Regarding Any Damages Related To The October 2, 2004, Incident In Jay, Oklahoma** (document #215).  They did not obtain a ruling on this motion, however, nor did they object to the testimony in question when it was offered by Raz during trial.  They have, therefore, waived the arguments presented in this motion, and it will be denied.

4.    At the commencement of trial, Mueller sought and obtained leave to submit a brief clarifying the capacity in which he is sued.  A motion addressing that issue was filed on the first day of trial, entitled **Motion In Limine Seeking Clarification As To The Status Of Claims Against Defendant, FBI Director Robert Mueller, Or In The Alternative, For Summary Judgment** (document #217).

Raz has not responded to this motion, but his pleadings persuade the Court that he does not oppose it.  The Second Amended Petition Of Action To Stop Unconstitutional FBI Surveillance makes

it clear that what Raz seeks to enjoin is agency action, not individual action by Mueller. Paragraph 3.2 states that plaintiff's "only demand from FBI Director, Mr. Robert M. Mueller, and through him from the organization that he heads, the FBI, is that the Surveillance and Operations that the FBI has been conducting against him in the last fifteen years be completely and absolutely stopped!"

In addition, the Court notes that Raz does not state that Mueller is sued in his individual capacity. In order to sue a public official in his individual capacity, a plaintiff must "expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity." **Johnson v. Outboard Marine Corp.**, **172 F.3d 531 (8th Cir. 1999).**

For these reasons, the Court concludes that Mueller is sued only in his official, representative capacity, and to that extent defendant's motion seeking clarification will be granted.

5. The discovery process in this case was lengthy and contentious. On several occasions the Court was requested to and did review materials *in camera* to determine whether production of documents would be required, and whether redactions to documents would be permitted.

All discovery disputes, save one, were resolved prior to trial:

Raz sought and obtained leave to propound Revised Interrogatory 21, which makes the following inquiry:

> According to a speech of FBI Director, Robert Meuller, FBI maintains a 'Terrorism-Watch List'.
> 21.1) Is Plaintiff, Yoram Raz, on FBI's 'Terrorism-Watch List'?
> 21.2) When was Plaintiff, Yoram Raz, entered into FBI's 'Terrorism-Watch List'? If he had previously been on that list but removed at a later time please provide all relevant dates as well as the reasons he was previously entered and later removed from that list.

Raz also obtained leave to propound Request For Production 26, which requests as follows:

> Please provide legible copies of all Records in the Possession of FBI (that have not yet been produced to Plaintiff and that have not been submitted to in-camera review in this District Court) that explain, or otherwise relate, to the entry of Plaintiff, Yoram Raz, into FBI's 'Terrorism Watch List'.

Defendants objected to these discovery requests, basing their objections on the law enforcement investigatory files privilege.

Raz then filed a **Motion To Compel Defendants To Answer Revise Interrogatory 21 And Request For Production 26** (document #208)("Motion To Compel"). Defendants obtained an extension until July 29, 2005, to respond to the Motion To Compel, in order to secure an affidavit said to be necessary to their response.

Although this response date fell after the trial date, the Court determined that a continuance was not necessary, as the record could be held open for such evidence as might come to light, depending on the resolution of the motion to compel. It so ordered and the trial proceeded as scheduled.

After the trial was held and concluded and within the time permitted by the extension they had obtained, defendants filed their Response to the Motion To Compel.

Raz, for his part, filed a **Motion For Leave To File Supplement To Motion To Compel Revised Interrogatory 21 And Request 26** (document #236).  That motion will be granted, and the supplement iself, which was attached to the motion, has been fully considered.

The issues raised by the Motion To Compel, being ripe for decision,  will be addressed as a preamble to the Court's decision on the merits in this case.

6.    Courts have long recognized the existence of a qualified privilege to prevent the disclosure of the investigatory files of law enforcement agencies, which balances "the public interest in nondisclosure" of such files against "the need of the particular litigant for access to the privileged information."  **Friedman v. Bache Halsey Stuart Shields, Inc.**, **738 F.2d 1336 (D.C. Cir. 1984)**.

A recent court opinion summarizes the nature and purpose of the privilege in the following way:

> The purpose of the privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise prevent interference in an investigation.  A finding that the documents fall within the scope of the law enforcement investigatory privilege does not end the Court's analysis.  The law enforcement investigatory

> privilege is not absolute.  It can be overridden in
> appropriate cases by the need for the privileged
> materials.

**Jones v. City of Indianapolis**, **216 F.R.D. 440 (S.D.Ind. 2003)**,

(internal citations and quotation marks omitted).

The party claiming this privilege must show a formal claim of privilege by the head of the department having control over the documents in question, made after actual personal consideration of the documents, and there must be an explanation of why the specific information falls within the scope of the privilege.  **In re Sealed Case**, **856 F.2d 268 (D.C. Cir. 1988)**.

Defendants offer the Affidavit of Thomas J. Harrington, Deputy Assistant Director of Operational Support in the Counterterrorism Division of the F.B.I., in support of their claim of privilege.  A redacted copy of this Affidavit was filed publicly, and an unredacted copy was supplied to the Court for review *in camera*.[1]

Harrington avers that he commands units of the FBI which monitor terrorist threats, disseminate information about those threats, track the movement of suspected terrorists, and coordinate investigations of those suspects.  He is familiar with

---

[1]Raz objected to this *in camera* review, claiming that it amounted to an *ex parte* communication with the Court and that it would make the Court's ruling on the Motion To Compel essentially unreviewable.  The Court rejects both these contentions.  *In camera* review is a time-honored technique for resolving discovery and evidentiary disputes, one which Raz himself has invoked several times in this case.  It does not involve a private communication between the attorney for one party and the Court, which is the essence of an *ex parte* communication.  The Court's decision is subject to review on appeal just as any other issue.  Indeed, the Court's decision on the issue does not turn on any of the redacted portions of the Affidavit.

the development, structure, workings, and use of the Terrorist

Screening Database ("TSDB") maintained by the Terrorist Screening

Center ("TSC") which he describes as a "multi-agency organization

that is funded and administratively managed by the FBI."

Harrington asserts the law enforcement investigatory files

privilege as to "any information regarding individuals nominated

to the TSDB by the FBI." His explanation of why this information

falls within that privilege is as follows:

> If an individual who is included in the TSDB or any
> other screening-agency database is informed of that
> fact, this disclosure would likely compromise any
> ongoing FBI investigation of that individual. Subjects
> armed with such knowledge will naturally tend to alter
> their behavior, taking new precautions against
> surveillance and changing their level of terrorism-
> related activity. For example, after realizing he was
> under suspicion, a subject might alter his appearance or
> acquire identification in another name to evade
> detection. In addition, this knowledge might enable
> subjects to anticipate the activities and reaction of
> law enforcement officers, perhaps conducting counter-
> surveillance activities that could place federal agents
> at greater risk.
>
> *     *     *
>
> The law enforcement privilege should also protect
> against informing an individual that he is not included
> in the TSDB or any screening-agency database. If an
> individual has a desire to commit a terrorist act,
> notifying him that he is not included on any watch list
> would serve as encouragement to commit the act.
> Similarly, terrorist groups could manipulate the system
> to discover which of their members are not included on
> any watch list and, thus, have escaped the attention of
> law enforcement. Obviously these members would have a
> greater chance of avoiding detection by law enforcement
> while preparing a terrorist operation.

These averments, contained in the redacted Affidavit filed

publicly, are sufficient to convince the Court that the information sought by Raz is subject to the law enforcement investigatory files privilege.

7.    Finding that the privilege applies does not, however, conclude the inquiry.  The privilege is a qualified one, and "when the existence of such a conditional privilege is established, there is a need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information."  **Friedman**, *supra*, **738 F.2d at 1341.**

Ten factors have been posited as relevant to this balancing test, but in the case at bar the Court finds one of those factors of such overwhelming weight in connection with the present inquiry that the others need not be considered.  That factor is "the importance of the information sought to the plaintiff's case."  **Friedman**, **738 F.2d at 1343.**  Given the Court's findings of fact and conclusions of law on the substantive issues, as set forth below, it is of no importance whatsoever to Raz's case whether he is, or is not, in the TSDB.  He has failed to prove other essential elements of his claims, and therefore could not prevail regardless of the information which the FBI seeks to protect.

For the foregoing reasons, the Court concludes that the FBI is entitled to the protection of the law enforcement investigatory files privilege, and that Raz's Motion To Compel should be denied.

8.    In attempting to prove facts thought to be relevant to

their cases, both plaintiff and defendants have placed into evidence numerous FBI documents. In many cases, the same documents have been offered by both parties. These documents, which span a time period from 1987 to 2005, have been subjected to various redactions over the years, some imposed by plaintiff and others by the defendants. In some cases data redacted on a document offered as an exhibit by one party is not redacted on the same document in the form offered by the other party. The Court's findings of fact embody a determination of the actual content of these documents -- which form a record of the activity of the FBI *vis a vis* Raz over the years -- made by comparing the various versions so as to determine to the maximum extent possible the unredacted text.

## Findings of Fact

9. Raz, who is presently a resident of Gentry, Arkansas, was born in Israel. He claims that the FBI has subjected him to continuous and unwarranted surveillance and harassment since he immigrated to the United States in October, 1987. For example, he testified that the FBI has maintained "monitoring stations" near his residences; employed undercover agents to stalk him; issued law enforcement "alerts" that caused him to be subjected to heightened police scrutiny wherever he went; conducted "sting operations" against him while he was shopping; and turned his acquaintances and dates into spies against him.

10.     Raz believes that he has been under surveillance because of the "expression of certain unpopular political opinions," such as his desire to see a peaceful resolution of the Israeli-Arab conflict and the establishment of an independent and peacefully co-existing Palestinian State in the West Bank and the Gaza Strip.

11.     Raz testified to experiencing numerous and widely varied incidents which he believed to constitute surveillance and harassment by the FBI.  He was not, however, able to specifically identify people or agencies involved in most of these incidents, identifying them only by such vague descriptions as "they" or "undercover agents."  Videotapes offered into evidence of people said to be conducting surveillance reveal ordinary-looking individuals acting in an ordinary manner in public places such as stores, roads, and parking lots.  Raz testified that he often did not know who was following him or watching him, and that his belief that these people were associated with the FBI is based in large part on the appearance of the people he suspects (such as a "marine haircut") and on their conduct (such as shopping in a store without a buggy and making no purchases).

The Court does not credit Raz's testimony that any of the people described in such vague terms were agents or employees of, or in any way associated with, the FBI.  Nothing more than speculation would support such a finding, and findings of fact in a judicial proceeding cannot be based on speculation.

12.  A much smaller portion of Raz's testimony dealt with specific people - identified either by name or by their association with the FBI or some other governmental agency - who had interactions with Raz suggesting that he was being watched or investigated.  In addition, documents maintained by the FBI and various law enforcement agencies were placed into evidence, and these documents indicate several different investigations involving Raz.

The Court has attempted to organize these incidents in chronological order, the better to perceive their extent and any possible connections between them, and thus to determine whether they rise to the level of unwarranted surveillance alleged in Raz's Complaints.

13.  The events of which Raz complains are said to have begun when he came to Fayetteville, Arkansas, in October, 1987.  Shortly after he arrived, an FBI agent and a police officer came to his apartment.  They asked him a few questions, but other than that, Raz did not indicate what the nature of their visit was.

14.  An FBI airtel dated November 5, 1987, reported that a caller had supplied information about Raz attending the meetings of a church singles group in Fayetteville, where several members had "expressed reservations about having him present."  The caller reported that these reservations were based on Raz's refusal to say why he was in Fayetteville, and whether he was working or was

a student.

Another caller, identified as "a former Naval Intelligence Officer," was said in this same document to have "expressed an opinion that RAZ is a spy," based in part on Raz's statement that he was "here to study the people."[2]

15. An FBI memo dated November 18, 1987, indicates the FBI obtained information from the U.S. Postal Service verifying Raz's residence address, mailing address, and telephone number.

16. An FBI memorandum dated November 30, 1987, reports that on November 24, 1987, a confidential source had advised that Raz had a Vermont driver's license which listed an Arkansas address. This document goes on to direct certain action to be taken by various offices. The "Albany Division" was directed to,

> [t]hrough contact with logical officials, determine how RAZ could obtain a Vermont driver's license with a Fayetteville, Arkansas, address; determine the city in which RAZ obtained his driver's license; and any other information regarding RAZ's entry into the United States, friends in the Vermont area, etc.

> The "Memphis Division" was directed to

> [t]hrough contact with INS, search RAZ, with date of birth [redacted] and request INS to conduct other searches in order to identify when RAZ entered the United States, port of entry, and other pertinent data.

17. An Immigration and Naturalization Service ("INS") search

---

[2]Raz has interpreted this statement as evidence that the FBI considered him a spy. It clearly does not carry that import. Like other FBI documents which contain reports of information conveyed by people who called the FBI to convey information, it is merely a repetition of what an informant told an agent – not a conclusion reached by the agent or the agency about the veracity of that information.

dated November 25, 1987, turned up three individuals with the name Yoram Raz who had entered the United States. Each had a different date of birth. One INS file was located in the New York INS office; one in the St. Albans, Vermont, INS office; and one in the Washington INS office. It was eventually determined that the Yoram Raz living in Fayetteville was the one whose file was located in St. Albans, and the other two offices discontinued any further investigation with regard to Raz.

18. According to an FBI memo dated January 14, 1988, the FBI was informed that Raz had moved to Little Rock, Arkansas, on January 5, 1988, "to take up permanent residence." The memo noted that the agency "[w]ill determine if a change of address has been filed for RAZ," and "[r]eassign to an Agent in Little Rock to continue this investigation."

19. The FBI Little Rock Field Office file contains a picture of Raz taken at a social event, apparently for identification. This photo was received on January 14, 1988.

20. An FBI airtel dated January 22, 1988, compiles a detailed background on Raz's visits to the United States in 1976 and 1987. It reflects that Raz came to the United States in 1976 on a student visa, with the stated intention of pursuing a degree in political science. Raz "failed to maintain his exchange visitor status in that he had stopped course work" and "violated his terms of admission as a non-immigrant" during the 1976 trip,

as a result of which he was required to leave the country.

This document goes on to report that Raz obtained a new passport in 1986, and returned to the United States on October 8, 1987, with a tourist visa that authorized him to remain in the United States until April 7, 1988.

This document also reports that as of December 31, 1987, Raz had a Vermont driver's license which he obtained in 1984 and which would expire in 1988, and that "it is permissible for a person to obtain a Vermont driver's license with an out of state address."

21. On February 9, 1988, an FBI document indicates that the FBI called Directory Assistance for the Little Rock area to obtain a telephone number for Raz. The following day, the FBI placed a pretext call to Raz's Fayetteville phone number and determined that it had been disconnected and changed to the number obtained from Directory Assistance the day before.

22. On February 10, 1988, a Postal Inspector informed the FBI that postal records reflected that Raz had rented a post office box in Little Rock on December 29, 1987, giving his Fayetteville address and telephone number.

23. On May 16, 1988, the FBI again ran an address check on Raz with the postal authorities in Fayetteville, and learned that there still had been no change of address.

24. An FBI memorandum dated May 20, 1988, relates to the "Little Rock airtel to Memphis dated 11/5/87." It reports that

"subsequent investigation by the Albany Division failed to develop any information that would justify further investigation regarding [Yoram Raz]," and recommends that "this case be closed."

25. Richard O'Connell, who was the Agent in Charge of the FBI Resident Agency in Fayetteville in 1987, acknowledged that there was an investigation which involved Raz in 1987, but he had very little recollection of it. He did recall that "there were a number of foreign students in the United States who were out of status with the INS, and the FBI had been asked to verify the location of some of those people." He was not sure if this was the reason for the investigation pertaining to Raz or not. He testified that he was certain, however, that the FBI did not conduct surveillance of Raz during that time period. He was unaware of any continuation to the investigation after Raz moved to Little Rock in 1988.

26. In February, 1992, Raz moved to rural Bienville Parish, Louisiana. During the time he lived there, he observed unmarked helicopters flying over his property, appearing to be searching for something. He inquired of the Bienville Parish Sheriff's Office whether they were conducting searches, but was not able to find out who was responsible for the helicopters.

27. At some point in 1992, Raz had a date with a woman in Bossier City, Louisiana, during which she began asking him questions about his "real purpose in coming here" and who his

"contacts" were.  He testified that he asked her if the FBI had put her up to asking him these questions, and that she said "I couldn't say to them 'no'."  Raz testified that the woman then gave him her phone number and left.  He does not, however, have any record of this woman's name or phone number.

While the Court credits Raz's testimony that his date questioned him in ways that made him suspicious, it cannot credit his testimony that she admitted involvement with the FBI. Given that by this time Raz believed he had been under intense FBI surveillance for four or five years, the Court has no doubt that if she had made such an admission, Raz would have recorded her name or telephone number or that he would otherwise have remembered more about her.  He said he did not.

28.  While in Bienville Parish, Raz experienced numerous acts of vandalism and intimidation.  His mailbox was knocked over several times; a car tried to run him off the road; his electric wires were cut; his trash was scattered; and people driving by his home late at night would honk and yell vulgar insults.  A videotape was received into evidence which recorded a passerby shouting "fuck you, Iranian," in the direction of Raz's house.

29.  Raz repeatedly requested assistance from the Bienville Parish Sheriff's Office ("BPSO") in dealing with the harassment he was experiencing, which he described as racially motivated.  The BPSO conducted some investigation and talked with some of the

offenders, but their efforts at dealing with the situation can be described as modest, at best. They did not succeed in stopping the harassment.

On October 10, 1998, Raz told Bienville Parish Sheriff's Deputy Randy Price that he had prepared a lawsuit against Bienville Parish Sheriff Joe Storey, several deputies, and the FBI. Sheriff Storey was aware of this information before October 13, 1998.

30. On October 13, 1998, officers of the BPSO entered Raz's home while he was sleeping. Raz was disoriented and frightened. He did not know who was in his home, and thought someone was trying to kill him. A violent struggle ensued, during which Raz was chained with his hands and feet behind his back, and transported to the emergency room at Louisiana State University Medical Center ("LSUMC").

31. While Raz believes that the FBI was implicated in the incident at his home on October 13, 1998, there is no evidence to support this belief.

The mere fact that Raz had told Storey he planned to sue both Storey and the FBI does not provide an evidentiary link between the FBI and the events at Raz's home on October 13. As with other conclusions drawn by Raz but unsupported by credible evidence, the Court does not credit his belief that the FBI was involved in this incident.

32.  On October 20, 1998, after being released from LSUMC, Raz went to the Shreveport chambers of Judge Henry A. Politz, Chief Judge of the United States Court of Appeals for the Fifth Circuit.  He wanted to show Judge Politz the injuries he had sustained in the incident of October 13, 1998.  Raz was still suffering the physical and mental effects of that incident, and its aftermath when he was medicated at LSUMC.  He testified that he looked "horrible" and that his speech was slurred and difficult to understand.

The visit to Judge Politz's chambers went predictably awry when Raz began removing his clothing in the presence of the law clerks in order to reveal his injuries.  Court security officers were called, and Raz was taken to the United States Marshal's Office to be questioned.

33.  Deputy Marshal Michael Moriarty talked at some length with Raz about the incident in Judge Politz's chambers and about the incident at Raz's home involving the BPSO.  He suggested that Raz talk to local FBI agents about what had happened in Bienville Parish, and Raz reluctantly agreed.

34.  At the Shreveport FBI Office on October 20, 1998, Raz was questioned about the Bienville Parish incident by Special Agent Monica Miller, who understood Raz to be reporting a hate crime that he believed had been committed against him by the BPSO because he is Jewish.

35. From Raz's perspective, his questioning at the FBI office seemed like an interrogation - as if the FBI was investigating him, rather than the hate crime he had come to report. He testified that Miller and the others seemed more interested in what he knew about FBI surveillance, and in the security cameras he had installed on his property in Bienville Parish, than in what had happened to him on October 13, 1998.

Miller agreed that she and the other FBI agents questioned Raz about why he believed the FBI had him under surveillance, but explained that it was natural for them to do so, since that was one of the things he was complaining of.

The Court credits the testimony of both Raz and Miller in regard to the topics of questioning on October 20, 1998. Their testimony is not really in conflict, but rather displays differences in perceptions about the same event.

36. Miller performed a rather perfunctory investigation of Raz's complaint. She did no independent investigation, but did gather reports from other agencies. She obtained Raz's medical records relating to the LSUMC admission; the report of the Bienville Parish Sheriff's Office about the October 13 incident; and information from the U.S. Marshal's Service about the incident in Judge Politz's chambers. On October 22, 1998, Miller wrote a report about the Bienville Parish incident.

Raz contends that this Report contains several inaccuracies

which show that the FBI was trying to cover up an investigation of him at that time.

37. One such alleged inaccuracy is the statement that

RAZ's ex-wife, Linda Kuelper, in a separate interview, stated that she contacted the Bienville Sheriff's Office on 10/13/1998 and requested a welfare check on her ex-husband after being unable to reach him via telephone.

Miller could not recall who conducted the interview with Linda Kuelper, nor could Special Agent William Larsh, who was also present when Raz came to the Shreveport office.

Raz questioned both Miller and Larsh in a manner designed to draw out evidence that the statement was a deliberate falsehood placed in the report to justify what he believes was an illegal entry into his home by the BPSO.

He also placed into evidence the deposition of Linda Kuelper, who testified that she spoke with Raz at about 7:30 p.m. on October 13, 1998, at which time she became concerned about his welfare. She did not, however, call the Sheriff. She called a Reverend Birnbrook, and asked him to "go check on" Raz. When Kuelper called Raz's telephone number some 30-45 minutes later, Birnbrook answered the phone. Kuelper could hear yelling in the background, and Birnbrook told her "there was a lot of chaos there," and that "they would probably take [Raz] to the hospital," from which it may be inferred that the Bienville Parish Sheriff's Deputies were at Raz's home at that time.

The discrepancy involving Linda Kuelper in Miller's report

does raise questions about the conduct of the BPSO in connection with the entry into Raz's home on October 13, 1998. It does not, however, constitute evidence of a cover-up for any conduct on the part of the FBI. At most, the discrepancy would offer cover for the BPSO, not the FBI.

38. Another alleged inaccuracy is the statement in Miller's report that Raz believed what had happened in Bienville Parish was because he was Jewish. Raz points out that the taunts he was hearing at his home in Bienville Parish were based on the perception of the hecklers that he was Iranian, and that he would hardly have told Miller something completely different.

While Miller may have incorrectly reported what Raz told her about his perception of the reason for the hate crimes, there is no evidence to support a finding that this in any way implicates the FBI in any wrongdoing.

39. Raz also testified that Miller's report was inaccurate with regard to the contents of his medical records, and in particular, the statement that he was "delusional and exhibiting paranoid behavior upon his admission." He contends that the FBI included such statements in reports about him in order to undermine his credibility in connection with his claims that the FBI was subjecting him to undue surveillance and harassment.

The Court is unable to make a factual determination about the accuracy or inaccuracy of the statement about Raz's medical

records, however, because the medical records were not offered into evidence.

40.  On February 3, 1999, Raz filed the first of five actions in the United States District Court for the Western District of Louisiana, Shreveport Division.[3]  In addition to the defendants now before the Court, these cases eventually included a wide range of defendants, from Wal-Mart (for allegedly allowing their premises and security system to be used for surveillance of Raz) to Pastor Birnbrook (for allegedly calling 911 the night of October 13, 1998) to LSU and the doctors who treated Raz there to the United States Marshal's Service (for allegedly releasing Raz's file to the Bienville Parish Sheriff's Office in violation of the Privacy Act).

Both parties seem to believe that these filings are relevant. Raz appears to contend that their summary dismissal shows that the FBI had such widespread power that he could get no justice in Louisiana.  Defendants appear to contend they show that Raz was suing everyone he came into contact with for the same type of conduct.  The Court rejects Raz's apparent contention out of hand, finding absolutely no evidence to so impugn the integrity of the Federal Courts sitting in Louisiana.  It likewise rejects

---

[3]These case are Raz v. United States and Additional Defendants, case number CV99-0202-S (filed February 3, 1999); Raz v. Joe Storey, Sheriff of Bienville Parish, et al, case number CV99-1850-S (filed October 8, 1999); Raz v. Louisiana State University Medical Center - Shreveport, et al., case nuber CV01-0381-S (filed March 2, 2001); Raz v. United States, case number CV01-03887-S (filed March 2, 2001); and Raz v. United States Marshall Service, et al., case number CV01-0399-S (filed March 6, 2001).

defendants' views as being irrelevant to the substantive issues before this Court, or to any procedural issue, since defendants do not argue for issue or claim preclusion on the basis of the dismissal of these suits.

41.   Raz became a "United States person" in April, 2001, apparently by virtue of his marriage to an American citizen. While this status is not precisely defined in the record, Special Agent James Hight of the Tulsa FBI office testified that there is "not a lot of distinction" between the status of a United States citizen and a United States person.   Raz claims to be a United States citizen, and his status as such does not appear to be disputed.

42.   On September 11, 2001, upon learning of the attacks on the Twin Towers, Raz expected to be put under surveillance.   When he left his home that afternoon, he was followed by a number of cars.   There is no evidence about who was in those cars, however, and while the Court does not doubt that Raz was closely observed by his neighbors on that terrible day, it finds no evidence that the FBI was responsible for such close observation.

43.   A "routine" report from the Shreveport office of the FBI to the New Orleans and New York offices, dated September 17, 2001, bears the title "MAIN CASE 182 TWIN TOWER BOMBING." It states that the office had received one phone call on September 14, 2001, and two more on September 17, 2001, about an unnamed "gentleman who

lives off of Jacob/Knotts Road." From the text of the report, it can be determined that the subject of the calls was Raz. The callers were all said to have conveyed basically the same information, to-wit that

> he acted very strange and always kept to himself. . .
> live[d] in the woods. . . a big orange gate with two
> cameras on it can be seen from the road. The house is
> located way back off the road and has more cameras
> located on it. Callers state that there is a huge
> satellite on his property. . . . his wife was not allowed to enter some of the rooms . . . . he is said to have one
> huge concrete room with nothing in it but computers . . . .
> believed to be of Iranian descent and whenever asked a question he
> always replys [sic] "that is private." Callers stated that
> absolutely no one in the small town of Caster [sic] knows his name
> or how he makes a living since he hardly ever leaves the property.

44. A brief memo in the Shreveport FBI files records a call to the FBI on September 18, 2001, reporting that Raz had "made comments about hating the United States."

45. On September 18, 2001, Special Agent Spoon of the Shreveport FBI office was asked to determine the whereabouts of Raz, based on information "that Raz had loaded up a U-haul truck and departed from the area." Spoon telephoned the BPSO and spoke with a deputy, who reported that Raz had been seen at his residence that day and was still in the area and "is not moving."

Spoon also inquired about, and included in his report, "what was observed at Raz's residence when it was searched by BPSD[4] a few years ago." Raz testified at some length as to errors in this information, but the errors in question do not bear on the issues

---

[4]Bienville Parish Sheriff's Department.

in this case, and they appear to have come from sources other than the FBI.

One part of the report that was not challenged is Spoon's statement that

> [t]he BPSD was concerned that because RAZ had numerous security cameras at his house and was a foreign national that he might be involved in crime of some sort or posed a threat to our national security. The writer [Spoon] was contacted back then [October, 1998] by Sheriff Storey and Deputy Raley. The writer and former SSRA William Larsh advised that absent additional information the FBI could not open a case on Raz.

This statement is persuasive evidence that the FBI was not involved in the October 13, 1998, incident, and in fact, declined an invitation to become involved.

The same conclusion was reached in 2001, according to Special Agent Clifford Bland, who testified that he conducted a "threat assessment" of Raz because of the calls listed above, and concluded that Raz did not pose a threat "warranting the use of agency resources."

46. On November 5, 2001, Raz called the BPSO to complain about someone shooting on his property. The shooting did not sound to him like someone who was hunting, and Raz believed it was a form of intimidation. He was told that "Deputy Price handled my calls," and that Price was not there but a message would be left for him.

47. An Offense Report from the BPSO noted that a report of "alleged harassment" had been received by phone at 8:54 on

November 5, 2001, and that "DY PRICE" found a message on his message board on November 5, 2001, "TO CONTACT RAZ AT 544-8681 REFERENCE SHOOTING AND TELEPHONE HARASSMENT."  Instead of calling Raz, however, Deputy Price called the local office of the FBI and passed the information on to Spoon, who was to relay it to one of the other agents for a follow up.  Price did not call Raz about the incident.

48.  Also on November 5, 2001, an employee of the Louisiana Office of Motor Vehicles notified the New Orleans office of the FBI that Raz (then a resident of Louisiana) had an Arizona driver's license, and that he had "come in the office and purchased several registrations at different times for different people."  This employee noted, "I am sure Mr. Raz had legitimate reasons for doing this, however, due to recent current events I thought I would let you know in case you felt further investigation was necessary."

49.  Raz left Bienville Parish on May 29, 2002, and came to northwest Arkansas.  He felt that he was being followed on this trip, and that he was under "round the clock surveillance" until October, 2002, although he was not able to offer any evidence of such surveillance, or to identify who might be conducting it.

50.  Raz filed the cases now under consideration in September, 2002.

51.  A FBI report dated April 1, 2003, details an incident

that took place in Colcord, Oklahoma, a few miles west of Siloam Springs, Arkansas. The report, authored by FBI Agent Anthony Smith, a member of the Joint Terrorism Task Force ("JTTF") is entitled "ACTS OF TERRORISM PREVENTION." It deals with the investigation of "suspicious activity concerning video taping of a propane facility, Anderson Propane, on the Arkansas/Oklahoma border." Smith states that on March 30, 2003, Siloam Springs Police Officer Scott Miller pursued Raz for "speeding and other traffic violations" as he crossed the border from Arkansas into Oklahoma. When stopped, the report goes on, Raz "immediately became confrontational and refused to give basic information such as his place of employment, stating it was confidential." After issuing citations, the Siloam Springs Police officer observed Raz video taping him (the officer), but the report goes on to say that Raz "could have video taped the facility."

The report further states that Raz contacted the Siloam Springs Police officer later in the day with a receipt for propane purchased at Anderson Propane after the traffic stop.

52. Smith contacted the Gentry Police Department on March 31, 2003, for help locating Raz's residence. The Gentry Police contact reported that Raz "is the paranoid type." When Smith contacted Raz at his cell phone number, Raz

> sounded very cautious and evasive over the phone after realizing he was speaking with a member of the Task Force. . . . wanted to know if this call was recorded and if he was being followed. [Raz] remained evasive on

the phone and advised that he would contact writer on 04/01/2003 to set up an appointment in Fayetteville.

The report concluded with the information that Raz called back the next day and refused to meet with Smith "until the FBI acted legally and stopped following him."

53. Another document, entitled "Squad 7 Weekly Update (JTTF-A), covering the period from March 30, 2003, to April 5, 2003, also includes a report of the Anderson Propane incident, as follows:

> TFO Smith received report of middle east person video taping propane facility on Arkansas/Oklahoma border. Raz Yoram (USPER), video taped local police after his traffic stop. Yoram, may suffer from paranoia and believes the FBI has been following him for sometime [sic], Yoram refused to be interviewed.

54. A few days after the Anderson Propane incident, Siloam Springs Police Officer Miller contacted Raz, wanting to come talk to Raz. Raz refused.

55. On July 23, 2003, while visiting a storage room he had rented, Raz found items that did not belong to him. The Siloam Springs Police Department investigated. Its report states that another customer had mistakenly placed items in Raz's unit, using a key which worked in Raz's lock. That customer removed the items from Raz's storage unit.

56. Raz later determined that a videotape he had made of some of the incidents in Bienville Parish was missing from the storage room. He testified that he tried to obtain another copy

of this tape from the United States District Court Clerk and the United States Attorney's Office in Shreveport, and the Bienville Parish Sheriff's Department, without success.

57.   In late 2003, Raz installed four cameras and a satellite dish on the roof of his car, mounted in a device constructed out of PVC pipe.  His purpose was to gather evidence of surveillance. The device did not look like an assemblage of cameras, however. It looked like some sort of weaponry.

58.   On May 28, 2004, a Deputy Livermore contacted the Fayetteville Resident Agency of the FBI to report an individual driving a car with a "satellite dish mounted on the roof," walking toward the Federal Courthouse in Fayetteville with a briefcase and an umbrella.  Deputy Livermore reported that he had spoken with this person the week before and had been told that "he could not discuss the satellite."

When FBI agents stopped the person in question as he walked back to his car, he at first refused to identify himself, but then identified himself as Raz.  Raz was unwilling to talk with the agents.

59.   On June 30, 2004, the FBI office in New Orleans received a call from an automobile dealership in Many, Louisiana.  The caller stated that on June 29, Raz had come to the dealership to buy a part for a 1994 Crown Victoria.  Raz was driving the car with the cameras on top.  The caller reported that the car has "a

weird mechanical thing installed on the roof. . . . it looked like a rocket launcher," and that Raz "repeatedly stated to the dealership employees not to ask him any questions about the object on the top of his vehicle." According to the caller, Raz returned the next day in the Crown Victoria, in which was observed a placard bearing the words "United States Postal Inspector, Official Business," and a box of 32 Smith and Wesson ammunition.

60.  On August 6, 2004, Raz made a trip from his home in Gentry to the Wal-Mart Store in Siloam Springs.  There was traffic on the highway, and Raz felt that some of the cars were following him.  He based this belief on a test he sometimes performed to determine if he was being followed, slowing down or speeding up to see if the vehicle behind him maintained a constant distance away from him.

In the Wal-Mart parking lot, Raz was approached by Siloam Springs Police Officers Scott Miller and Bryan Austin, who looked at the cameras on top of his car, and gave him a business card.

61.  At some point while Officers Miller and Austin were talking to Raz, a woman approached and said something to the officers about a person who was intoxicated.  Raz understood her to be saying that she had seen him (Raz) "swerving all over the road."  Raz believed that this woman had been planted to watch him because he had seen her before.

The Siloam Springs Central Dispatch Radio Station Log for

August 6, 2004, at 5157 hours, reports that the police were alerted to "AREA OF HWY 59N FOR POSS CODE 2 WHT SEDAN," which Raz testified was his car. Another entry that same date and time reads "IS THE CALLER STILL ON THE LINE...ADV YES...HAVE THEM TELL US WHEN THE CAR TURNS." At 2202, an entry reads "BE OUT W/THAT CAR AR297GLB," which Raz testified was his license plate.

62. On the way home from Siloam Springs that night, a vehicle associated with the Benton County Sheriff's Office was traveling several cars behind Raz. When Raz turned off the highway, the Sheriff's Office car continued on its way.

63. On October 2, 2004, the Delaware County Sheriff's Office ("DCSO") contacted the Oklahoma FBI office with regard to a 911 call from "a concerned citizen regarding a suspicious Middle Eastern male," who was reported to be driving "a white car with a satellite dish mounted on the roof along with what appeared to be four 4 inch pipe bombs."

64. The DCSO stopped Raz to investigate the 911 call. Meanwhile, at the request of DCSO, Special Agent Cindy Alexander in the Oklahoma City office of the FBI carried out various investigations via computer on Raz's car, its license plate, and Raz himself. She learned about the call received by the Shreveport FBI office on July 13, 2004, concerning Raz and the vehicle with "four rocket launchers" mounted on its roof. She also learned about the vehicle driven by Raz which contained the

United States Postal Inspector Official Business placard and the box of .32 caliber ammunition.

65. Based on what she had learned, Alexander advised the DCSO that Raz "was of investigative interest to the FBI." She advised the DCSO to follow their usual protocols "with regard to suspicious containers and the report of pipe bombs," and to "exercise extreme caution around Raz until it could be determined what the pipes were and if there were any weapons or explosives within the vehicle."

66. Alexander also contacted the Tulsa office of the JTTF to inform them of the situation. Special Agent James Hight, supervisor of the Tulsa FBI office, requested that the Vinita FBI office respond to the situation in Jay.

Hight testified that the decision to detain Raz for several hours at the scene of this incident was based on a request of the FBI. When asked why there was any perception of a terrorist threat in the incident, Hight testified that

> the Department of Homeland Security had law enforcement on a heightened sense of alert during that period of time. Basically, with the fall elections coming up in November, it was – it was believed, which has been widely reported, that based on what happened in Madrid, Spain immediately prior to their national elections, that Al Quada [sic] or other terrorist networks would attempt to stage an attack or attacks to disrupt our national elections.
>
> On that particular Saturday, there were several high profile events ongoing in Oklahoma, two of which were home football games at Oklahoma State University and the University of Oklahoma at Norman.

67.  Alexander prepared an Urgent Report to the Director of the FBI about the Jay incident.  Its subject was stated to be "Yoram Raz, Possible Terrorist Threat – United States Citizen." This report summarized the relevant information obtained by Alexander in the course of the day's investigatory activities. This document is the last involvement of the FBI with Raz shown by the evidence.

68.  Since June 8, 2005, Raz has lived in Gentry, Arkansas, on property owned by his former mother in law, Ruth Kuelper.  Ruth Kuelper testified that after Raz moved to her property, she observed an unmarked yellow airplane flying low over the property and circling five or six times, as though searching for something. She also testified that shortly after Raz moved to Gentry, he helped her install an air conditioner in her home.  While Raz was at her house, Keith Smith, Gentry Chief of Police, stopped by, saying he had had a call on a "welfare concern" and asking if the man at her house was Raz.  Smith told her that he did not remember who had called him about the "welfare concern."  There was no evidence that either of these events was connected to the FBI.

69.  Raz also observed the yellow airplane circling his home on one occasion.  The pilot was looking out of the plane through binoculars.  When Raz tried to record this with a video camera, the plane flew away.

70.  Raz testified that in Israel, because of his pacifist

views, he was considered a "leftist" and a "traitor," but not a terrorist.[5]  Since he has been in the United States, Raz has not made any speeches or published any writings about his political beliefs.  He has not engaged in any kind of political activity at all, with the exception of one visit to a temple in Shreveport, Louisiana, where he caused "a great uproar" when he voiced his opinions about Palestine.  At trial, no witness - except Raz - was shown to know anything about Raz's political beliefs.

71.  Raz testified that over the years that he has lived in the United States, he has frequently been stopped by state and local law enforcement officials, who appeared to be very familiar with him and who were trying to catch him speeding.  In spite of this, he has never been arrested or put in jail, and has had only minor traffic violations.

72.  All the FBI agents who testified, except for Hight, were asked if they were aware of any FBI surveillance of Raz.  Without exception, they testified that they were not aware of any such surveillance.

*    O'Connell testified that he would have been aware of such surveillance if it were occurring, and he was not aware of any.

*    Miller testified that the Shreveport FBI office

_____

[5]Raz offers no explanation for his apparently sincere belief that the FBI has trailed him for years on suspicion of being a terrorist, given his pacifist history, a pacifist being, after all, the very antithesis of a terrorist.

conducted some surveillance while she was stationed there, but no surveillance of Raz, and that everyone in the office generally knew about surveillance when it was being conducted. She also testified that if the FBI had carried out surveillance, searches, "stings," or similar operations, there would be records of those operations, and she had not seen any such records relating to Raz.

\* Special Agent Michael Faries, who was stationed in the Shreveport Office when Raz made his "hate crime" report in October, 1998, testified that surveillance is always recorded on an "FD-302" investigative report form, and kept with the file of the investigation. He further testified that when Raz came to the office in October, 1998, they would have run an "indices check" to see if Raz's name appeared in reference to any other cases as part of standard procedure. Faries was aware of no surveillance of Raz.

\* Larsh, who was the supervisory agent of the FBI office in Shreveport from November, 1997, through May, 1999, was aware of no surveillance of Raz during that period of time or any other time.

\* Bland testified that if the FBI had carried out the types of operations alleged by Raz, there would be some record of it, and there were no such records.

\* Smith testified that he was not aware of any surveillance involving Raz.

\*      David Sturgill, Supervising Special Resident Agent of the Fort Smith FBI office, testified that if there had been surveillance of Raz, it would be documented in his files, and that there is no indication in the files of any such surveillance. Sturgill testified that normally all agents in an area are involved when surveillance is being conducted, and that it is only conducted in significant cases because it is very "resource intensive."

\*      Alexander testified that if the FBI had had Raz under surveillance, there would be records of such surveillance, and that she found no such records in her search.

## Conclusions of Law

73.    Raz's suit against the FBI asks the Court to enjoin the FBI from conducting surveillance of him or harassing him, which he claims is being done because of his political opinions.  In **Clark v. Library of Congress**, **750 F.2d 89 (8th Cir. 1984),** the Eighth Circuit established the following parameters for such a claim:

> The first amendment protects the rights of all citizens . . . to hold political beliefs and belong to lawful political parties and associations. . . . [C]itizens . . . have a constitutional right to form political beliefs and lawful associations without governmental intrusion. . . . Significant impairment of these first amendment rights must withstand exacting scrutiny and may not be justified on a showing of a mere legitimate state interest.  Exacting scrutiny is especially appropriate where the government action is motivated solely by an individual's lawful beliefs or associations, for government action so predicated is imbued with the potential for subtle coercion of the individual to abandon his controversial beliefs or

associations.  Whether or not the government intended to punish or coerce the individual cannot be the sole test of legitimacy in such governmental action.  Where the government's action inflicts a palpable injury on the individual because of his lawful beliefs, it has the direct and consequent effect of chilling his rights to freedom of belief and association.  For these reasons, the Supreme Court has held such governmental actions may be justified only upon a showing of a paramount or vital governmental interest.  The burden is on the government to show the existence of such an interest.  Moreover, the government must demonstrate that the means chosen to further its compelling interest are those least restrictive of freedom of belief and association.

**750 F.2d 89** (internal citations omitted).

From **Clark** it can be seen that in order to prevail on his claim against the FBI, Raz has the burden of proving that the FBI significantly impaired his right to form and hold political beliefs, and that its conduct was motivated, at least in part, by Raz's beliefs or associations.

If Raz makes that showing, the FBI may offer as a defense that its conduct was justified by a vital governmental interest which it served by the least restrictive means available.

74.  Raz's FTCA claim against the United States asks for money damages allegedly suffered as a result of the torts of intentional infliction of emotional distress and invasion of privacy.  At the close of Raz's case in chief, on motion of the defendants, the Court granted judgment as a matter of law on the intentional infliction of emotional distress claim, and it will

not be further addressed in this opinion.[6]

75.   Under the provisions of the FTCA,

the government cedes its sovereign immunity to the
extent that it will allow itself to be sued "in the same
manner and to the same extent as a private individual
under like circumstances."  Thus, when a private party
asserts a tort claim against the United States, the
United States, subject to certain exceptions . . . may
be held liable to the same extent as if it were an
ordinary tortfeasor under state law.

**Audio Odyssey, Ltd. v. U.S.**, **373 F.3d 870 (8th Cir. 2004)** (internal

citation omitted).  To determine the elements that must be proven

in such a case, the Court must, therefore, look to the applicable

state law on invasion of privacy.  Because the events about which

Raz complains occurred in three different states, Arkansas,

Louisiana and Oklahoma, the Court has examined the law relating to

invasion of privacy claims in all three states.

76.   Invasion of privacy is frequently broken down into a

subset of four different causes of action, based on the four ways

in which case law has recognized that an actionable invasion of

privacy might occur.  Raz's Amended Complaint, given the liberal

reading afforded to *pro se* pleadings under **Haines v. Kerner**, **404

U.S. 519 (1972)**, alleges two forms of invasion of privacy:  (1)

intrusion upon plaintiff's seclusion, and (2) placing him in a

false light in the public eye.

77.   In order to prove an "intrusion" claim under Arkansas

_____

[6]Raz's Urgent Motion To Reconsider Rule 50(a) Dismissal will be addressed by
separate Order.

law, Raz must show that the FBI "intentionally intruded physically or otherwise" upon his solitude, and that it "lacked the necessary legal authority" to do so. **AMI Civil 2005, 420.** To establish a "false light" claim under Arkansas law, he must show that the FBI publicized false information about him, knowing or having a high degree of awareness that the information was false. **AMI Civil 2005, 423.**

78. Under Louisiana law, to prevail on either an "intrusion" claim or a "false light" claim, Raz must show that the FBI's conduct was unreasonable, and that it seriously interfered with his privacy interest. Reasonableness is to be determined by balancing Raz's interest in protecting his privacy against the FBI's interest in pursuing its course of conduct. **Hennig v. Alltel Communications, Inc.**, 903 So.2d 1137 (La.App. 5 Cir. 2005).

79. Under Oklahoma law, to prevail on an "intrusion" claim, Raz must show an unreasonable intrusion upon his seclusion which would be highly offensive to a reasonable person. **Colbert v. World Publishing Company**, 747 P.2d 286 (Ok.1987). To prevail on a "false light" claim, he must show that the FBI publicized a matter concerning him that placed him in a false light before the public; that such false light would be highly offensive to a reasonable person; and that the FBI knew of the falsity or recklessly disregarded a serious possibility that the information might be false. **Tanique, Inc. V. State of Oklahoma**, 99 P.3d 1209

**(Ok.Civ.App. 2004).**

80.  Regardless of which state's law is applied to Raz's invasion of privacy claims, it is necessary that he prove that the FBI not only invaded his privacy, but also that it violated his constitutional rights.  This is because, even under the FTCA, the government may not be sued on a claim that is based on employee action involving an element of judgment or choice – a discretionary function.  **Demery v. U.S. Department of Interior**, **357 F.3d 830 (8th Cir. 2004).**

Neither party disputes that the decision to carry out an investigation involves an element of judgment or choice on the part of the FBI, and therefore Raz's claims based on such decisions and their implementation would be barred by the discretionary function exception unless they involved the violation of a constitutional right. Federal agents do not have discretion to commit constitutional violations.  **Raz v. U.S.**, **343 F.3d 945 (8th Cir. 2003).**

81.  With regard to both of Raz's suits, the constitutional right alleged to have been violated is that protected by the First Amendment.  Raz claims the government's conduct was motivated by his political beliefs and opinions.  Both his pleadings and his testimony at trial were to the effect that the FBI placed him under surveillance, and continued that surveillance from 1987 until trial, because of his political views with regard to the

Israeli-Palestinian conflict.

82.  The Court concludes that all of Raz's claims fail on this threshold point.  The evidence at trial was insufficient to support a conclusion that anything the FBI did or did not do in connection with Raz was motivated by his views on the Israeli-Palestinian conflict – or any other political belief or opinion he held, for that matter.  Indeed, there was no evidence that any FBI agent was even aware of Raz's political views.  And while there is evidence that Raz was subjected to discrimination when he lived in Bienville Parish, that evidence supports the conclusion that the unknown individuals who drove past his house honking and heckling him late at night did so not because of his political views, but because they thought he was an Iranian.

83.  Even if Raz had established a prima facie case on one or more of his claims, his case would still fail.  This follows because the FBI has demonstrated that it was addressing compelling governmental interests in its various investigations of Raz, and chose the least restrictive means to further those interests.

(a)  At the time of the first FBI investigation, Raz was not yet a citizen, and the investigation began as a simple visa check – something any foreign national in this country should expect and not something restrictive of First Amendment rights.  At about the same time, the FBI received a report from a source who had concerns that Raz was a spy.  In the process of verifying Raz's

address and telephone number, the FBI learned that he had a Vermont driver's license which listed an Arkansas address - a discrepancy which would raise questions in the mind of any law enforcement officer. Followup with INS developed the information that Raz had violated the terms of a previous visa and had been required to leave the country. There was no evidence of misconduct during Raz's current visit to the United States, however, and the investigation was discontinued after the FBI had ascertained accurate information about Raz's whereabouts.

This 1987-88 investigation served the vital government interest of national security, in the sense of being aware of whether a foreign national is complying with the terms of the documents which authorize him to be lawfully in this country. It was in no way restrictive of Raz's political beliefs and activities.

(b) The next FBI investigation was initiated by Raz, when he went to the FBI office in Shreveport in 1998 to report a hate crime, and the Court rejects the notion that the FBI violated Raz's rights by doing something he called upon it to do. In addition, this investigation was in no way restrictive of Raz's political beliefs and activities, and was justified by the FBI's mandate to investigate hate crimes as the nation's chief law enforcement entity.

(c) The next investigation took place in the highly-charged

atmosphere of the weeks immediately following the Twin Tower attacks of September 11, 2001, and was motivated by several reports of peculiar conduct by a person who appeared to the callers to be "of Iranian descent" and who "made comments about hating the United States." The only "investigation" was a telephone inquiry from the FBI to the BPSO.

This cursory investigation was in no way restrictive of Raz's political activity, and was designed to obtain information sufficient to assure that Raz was not part of a terrorist group, clearly a compelling governmental interest. Cf. **Center for National Security Studies v. U.S. Department of Justice**, **331 F.3d 918 (D.C. Cir. 2003)** (September 11 terrorism investigation one of DOJ's chief law enforcement duties).

(d) The next investigation, in March, 2003, involved the Joint Terrorism Task Force and the Anderson Propane incident. Raz brought this investigation on himself by speeding and thereby drawing the attention to local law enforcement. When stopped at the propane facility, he was confrontational and refused to give the officers even the most basic information about himself. The FBI monitored this situation through local law enforcement and the JTTF, and made one attempt to talk to Raz about it, which was refused. Given the status of the war on terror, the potential for becoming a target of terrorist activity presented by a propane storage facility, and Raz's confrontational behavior, the FBI was

amply justified in carrying out its brief and completely unrestrictive investigation of this incident.

(e) On May 28, 2004, FBI agents attempted to talk with Raz when he visited the Federal Courthouse in Fayetteville, driving a car equipped with what appeared to be some sort of weaponry and a satellite dish. This attempt -- which hardly merits being called an investigation -- was amply justified by the suspicious appearance of Raz's vehicle. It was so unrestrictive of Raz's freedoms that, in spite of his refusal to talk with the agents, the investigation went no further. The Court finds that, to the extent this incident can even be described as an investigation, it was justified by the compelling governmental interest of preventing terrorist acts, and was carried out in the manner least restrictive of any of Raz's freedoms.

(f) The final FBI investigation occurred on October 2, 2004, and it also involved the car with the cameras on top. It was based on a report of a "suspicious Middle Eastern male" driving a car with "what appeared to be four 4 inch pipe bombs" on top, and occurred during a period of heightened terrorist alert, on a day when there were "several high profile events ongoing in Oklahoma." Raz was again uncooperative with law enforcment officers.

Under the circumstances, the investigation carried out by the FBI that day was clearly justified by the compelling governmental interest of preventing terrorist activity, and it was carried out

in a manner least restrictive of Raz's rights.

84. The foregoing analysis of FBI activity *vis a vis* Raz demonstrates why his invasion of privacy claims would likewise fail even if there were some constitutional nexus. To prove an "intrusion" claim under Arkansas law, Raz would have to show that the FBI lacked the necessary authority to intrude on his solitude, yet in each instance the FBI had authority, inasmuch as it was carrying out its law enforcement duties. An "intrusion" claim under Louisiana or Oklahoma law requires a showing that the "intrusion" is unreasonable, and given that the FBI was carrying out its mandate in each case, the Court finds that its conduct was not unreasonable.

With regard to Raz's "false light" claim, there was no evidence that the FBI conveyed false information about Raz to anyone, although some of the information it conveyed was information that had not been verified by investigation. The piece of information about which Raz appears most concerned is the statement, found in various reports, that Raz is paranoid or delusional. Yet Raz failed to offer into evidence the very documents he says would refute this claim, and much of his testimony, in the Court's opinion, was suggestive of the workings of an overly suspicious mind, which might reasonably persuade observers that he was paranoid or delusional.

Nor is there any indication that the FBI conveyed any

information about Raz to anyone outside of other law enforcement agencies. While the FBI did convey information to other law enforcement agencies, this does not constitute an invasion of privacy. Law enforcement officers are permitted to pool information in carrying out their duties. See, e.g., **U.S. v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993),** and cases cited therein, and **Krohn v. U.S., 742 F.2d 24 (1st Cir., 1984),** citing **Bartkus v. People of the State of Illinois, 359 U.S. 121 (1959).**

85. Many of the events about which Raz testified are irrelevant to his claims against the FBI.

(a)  The events in Bienville Parish are linked to the FBI only by the thinnest of threads: the Sheriff of Bienville Parish knew, a few days before the entry into Raz's home on October 13, 1998, that Raz planned to sue both him and the FBI. While one might speculate that the Sheriff was motivated to raid Raz's home by this information, even such speculation does not implicate the FBI in the events of October 13, 1998. Moreover, credible evidence indicates that the FBI specifically declined to investigate Raz at that time, finding no basis to do so.

(b)  The unauthorized entry into Raz's storage room in Siloam Springs, and the disappearance of a videotape, are not shown to be in any way related to the FBI.

(c)  The incident at the Siloam Springs Wal-Mart Store was not shown to be in any way related to the FBI.

(d)  Various incidents of planes or helicopters flying over Raz's property, or local law enforcement officers checking up on him, are not shown to be in any way related to the FBI.

(e)  Various traffic stops by local law enforcement officers are not shown to be related to the FBI.

86.  By way of explaining and justifying his inability to produce evidence of FBI surveillance, Raz pointed out that such operations are, by their very nature, clandestine.  He suggested during trial that the Court should relax his burden of proof due to the difficulty of developing evidence of clandestine activities.  The Court declines to do so, and rejects the notion that the difficulty of proving a fact would justify relaxation (or disregard) of the rules governing the introduction of evidence in federal court proceedings.  Those rules do not permit a party to establish a fact through the use of speculation or conjecture.

## Conclusion

87.  Based upon the proof presented, the Court concludes that plaintiff has failed to show, by a preponderance of the evidence, that he is entitled to relief against defendants.  The Court, therefore, finds that his claims should be dismissed with prejudice and that he take nothing thereon.

**IT IS THEREFORE ORDERED** that defendants' **Motion In Limine To Bar Testimony Regarding Any Damages Related To The October 2, 2004, Incident In Jay, Oklahoma** (document #215) is **denied.**

**IT IS FURTHER ORDERED** that defendants' **Motion In Limine Seeking Clarification As To The Status Of Claims Against Defendant, FBI Director Robert Mueller, Or In The Alternative, For Summary Judgment** (document #217) is **granted,** and the Court hereby directs that plaintiff's claims lie as against defendant Mueller only in his representative capacity as FBI Director, not in his individual capacity.

**IT IS FURTHER ORDERED** that plaintiff's **Motion For Leave To File Supplement To Motion To Compel Revised Interrogatory 21 And Request 26** (document #236) is **granted.**

**IT IS FURTHER ORDERED** that plaintiff's **Motion To Compel Defendants To Answer Revised Interrogatory 21 And Request For Production 26** (document #208) is **denied.**

**IT IS FURTHER ORDERED** that, with regard to the claims made by plaintiff and analyzed herein, judgment in favor of the defendants will be entered by separate order of even date herewith, directing that plaintiff's claims be dismissed with prejudice and that he take nothing thereon.

**IT IS SO ORDERED,** this 2nd day of September, 2005.


       **/s/ Jimm Larry Hendren**
       **JIMM LARRY HENDREN**
       **UNITED STATES DISTRICT JUDGE**